PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

SANDAKO MESHAWN BRANDON,
　　　　　*Defendant-Appellant.*

No. 03-4363

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellant,*

v.

SANDAKO MESHAWN BRANDON,
　　　　　*Defendant-Appellee.*

No. 03-4439

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CR-02-193)

Argued: January 22, 2004

Decided: March 31, 2004

Before WILKINSON, LUTTIG, and TRAXLER, Circuit Judges.

---

Affirmed in part, vacated and remanded in part, by published opinion. Judge Wilkinson wrote the opinion, in which Judge Luttig and Judge Traxler joined.

---

**COUNSEL**

**ARGUED:** Eric Jason Foster, Asheville, North Carolina, for Appellant/Cross-Appellee. Sandra Jane Hairston, Assistant United States Attorney, Greensboro, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee/Cross-Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

Federal informants wearing recording devices twice purchased crack cocaine from appellant Sandako M. Brandon. At Brandon's trial, the government played the tape-recorded conversations, and it also provided transcripts to the jury as an aid in listening to the recordings. Brandon was subsequently convicted on charges of drug conspiracy and distribution of crack cocaine. Brandon did not object to the transcripts during the trial, but he now claims that the trial court should have independently reviewed the transcripts before they were shown to the jury. Because the transcripts were accurate and the jury was properly instructed on their use, we find Brandon's argument without merit, and we affirm Brandon's convictions. However, because the district court wrongly discounted Brandon's prior convictions in determining whether Brandon was a career offender, we vacate and remand for resentencing.

I.

On March 8, 2002, Travis S. Knight, a paid informant working for the Federal Bureau of Investigation (FBI), met with a cocaine dealer named Joe Lee White in an attempt to purchase a "big eight," or four and one-half ounces of crack cocaine. Knight was wearing a recording device that tape-recorded the course of events between himself and White. White first told Knight that Brandon could supply the cocaine, and then White called Brandon, who agreed to the sale. Knight and White drove to Brandon's residence, and White went into Brandon's home and came out with a package of crack cocaine.

Knight weighed the cocaine, found that it was short of the expected four and one-half ounces, and negotiated a price cut. Knight counted out $3,750 and handed it to White, who carried the money into Brandon's house. Knight and White then left Brandon's house, and Knight subsequently delivered the recording device, the package of crack cocaine, and $150 in leftover "buy" money to FBI Special Agent John Spears.

On March 19, 2002, Knight returned to Brandon's house and spoke with Brandon himself. Knight again wore a recording device that tape-recorded their conversation. When Knight asked Brandon about obtaining another "big eight," Brandon quoted a price of "35" and told Knight to "holler at Joe." Knight understood Brandon to mean both that the price would be $3,500, and that Knight would again have to go through Joe Lee White in order to purchase the cocaine. As he had before, Knight delivered the recording device to Special Agent Spears.

At Brandon's subsequent trial for conspiracy to distribute cocaine base and distribution of cocaine base, the government introduced the recordings of Knight's conversations with White and Brandon. The first recording was of Knight's conversation with White on March 8. Both Knight and White identified their voices on the tape. In addition, both White and Special Agent Spears testified that the recording fairly and accurately represented the events of March 8. The government noted that a transcript of the March 8 tape had been provided to Brandon's counsel. The March 8 tape was subsequently admitted into evidence without objection from Brandon's counsel.

Once the March 8 tape had been admitted into evidence, the government requested permission to play the recording and to distribute copies of the transcript to the jury, so that jury members could read along as they listened to Knight and White's drug deal. Brandon's counsel lodged no objection, and the district court allowed the government to pass out copies of the transcript to the jury.

The government next introduced its tape-recording of Knight's conversation with Brandon on March 19. Knight identified the voices on the recording as his and Brandon's, and Special Agent Spears again testified that the recording fairly and accurately represented the

events of March 19. As with the March 8 tape, the March 19 tape was admitted into evidence without objection from Brandon's counsel. And once more, when the government sought permission to play the March 19 tape and distribute copies of a transcript to the jury, Brandon's counsel did not object and the government's request was granted.

Finally, at the close of evidence in the case, the government moved that the transcripts of the March 8 and March 19 tapes be admitted into evidence. Brandon's counsel offered no objection. As to the transcripts, the district court cautioned the jury that

> with respect to the transcript, that's not evidence, but you're to consider the tape itself as evidence — the tape recording as evidence, but the transcript is merely used to allow you to follow along with . . . what the recording was indicating. Your recollection of the tape itself or the tape recording is what controls in this case to the extent there's any difference between what you may have read on the transcript and what you heard on the tape.

The court thus made clear to the jurors that the tape recording was controlling, and that the transcript was intended only as an aid in listening to the recording. Moreover, the court repeated this warning during its instructions to the jury, and it did not allow the transcripts to be sent back into the jury room while the jury was deliberating.

## II.

Despite the district court's admirable caution, Brandon contends that the court erred in allowing use of the transcripts of the March 8 and March 19 tapes. Brandon does not actually claim that the transcripts were inaccurate in any respect. Rather, Brandon claims simply that the district court should have reviewed the transcripts and certified their accuracy — on the court's own initiative, no less, since Brandon never objected at trial to the transcripts nor asked the court to undertake any sort of review. Because Brandon never objected during his trial to the transcripts' use, we review his claim for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Higgs*, 353 F.3d 281, 309 (4th Cir. 2003).

To begin with, we have squarely rejected Brandon's claim before. In *United States v. Collazo*, 732 F.2d 1200, 1203-04 (4th Cir. 1984), facing virtually identical facts, we held that a district court had not abused its discretion in allowing the use of transcripts without first reviewing them. The district court in *Collazo* permitted jurors to use transcripts in listening to audio recordings admitted into evidence by the government. *Collazo*, 732 F.2d at 1203. The *Collazo* defendants never stipulated to the transcripts' accuracy, and the district court never attempted to verify their accuracy on its own. *Id.* But while the defendants voiced a general objection to use of the transcripts, they apparently pointed to no specific inaccuracies in the transcripts themselves. *Id.* at 1203-04.

On appeal, we held that the district court had acted within its discretion in permitting use of the disputed transcripts. *Id.* at 1203. We found it important that, as in the present case, federal agents had testified that the transcripts were authentic; defense counsel had been free to object to inaccuracies in the transcripts or to challenge the manner in which the transcripts were prepared; and the jury had been cautioned that the tapes rather than the transcripts were controlling in the event of any discrepancies. *Id.* at 1203-04. In light of these safeguards, the jury's use of the transcripts had not actually prejudiced the *Collazo* defendants, who had never attempted to challenge the transcripts' accuracy. *Id.* at 1203.

Brandon's case is even less persuasive than that of the *Collazo* defendants: at least in *Collazo*, the defendants offered some vague objection during the trial to use of the transcripts, while Brandon raises his objection for the first time on appeal. As the First Circuit has put it, "[w]e will not require trial judges to screen transcripts and to make objections where the parties themselves have raised none; we leave such legal advocacy to counsel." *United States v. DeLeon*, 187 F.3d 60, 65 (1st Cir. 1999). It is not incumbent on district courts to review transcripts in order to ensure their accuracy, when the parties themselves have not pointed to any inaccuracies.

Moreover, even were we to assume that the district court's failure to review the transcripts of the March 8 and 19 tape recordings was somehow plainly erroneous, Brandon could not plausibly contend that the error "affect[ed] substantial rights." *Olano*, 507 U.S. at 734. Bran-

don was free to explore through cross-examination any inaccuracies in the transcripts and to submit alternative versions. *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995) (citing *Collazo*, 732 F.2d at 1204). Far from it, Brandon's counsel repeatedly used the transcripts during cross-examination of both White and Knight and during closing argument. Brandon's counsel not only failed to challenge the transcripts in any respect, but felt comfortable enough with their veracity that he regularly depended on them during the trial. Indeed, even at oral argument, Brandon's counsel could not identify a single inaccuracy in the transcripts. That Brandon has not challenged the transcripts' fidelity to the recordings — either before the district court or now on appeal — leads us to conclude that the transcripts were substantially accurate. *Collazo*, 732 F.2d at 1204; *see also United States v. Frazier*, 280 F.3d 835, 849-50 (8th Cir. 2002).

In addition, as a result of the district court's cautionary instructions, the jury was made well aware that the transcripts were intended solely as an aid in listening to the March 8 and 19 tapes. As the district court explained to the jury: "Your recollection of the tape itself or the tape recording is what controls in this case to the extent there's any difference between what you may have read on the transcript and what you heard on the tape." The district court's repeated instructions to the jury thus ensured that the jury did not mistake the transcripts, rather than the tapes, as the critical pieces of evidence. *Capers*, 61 F.3d at 1107; *Collazo*, 732 F.2d at 1203; *see also United States v. Delgado*, 357 F.3d 1061, 1071 (9th Cir. 2004). Moreover, the district court did not permit the transcripts to be sent to the jury room during the jury's deliberations. There is in sum no chance that the defendant was prejudiced by the use of the transcripts in this case.

### III.

The government has cross-appealed, claiming that the district court should have sentenced Brandon as a career offender pursuant to § 4B1.1(a) of the Sentencing Guidelines. Section 4B1.1(a) states:

A defendant is a career offender if

(1)   the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction;

> (2)   the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and
>
> (3)   the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S. Sentencing Guidelines Manual § 4B1.1(a) (2003). It is undisputed that Brandon was at least eighteen years old when he was convicted before the district court of two controlled substance offenses, namely, drug conspiracy and distribution of cocaine base. And both parties agree that Brandon had one prior drug-related conviction from December 1998. Thus the only question is whether Brandon has a second prior qualifying conviction, and here the parties disagree over whether we may count Brandon's conviction in July 1997 for common law robbery.

In March 1997, Brandon was arrested and charged with both felony unlawful possession of a firearm and felony possession of crack cocaine with the intent to distribute. In April, based on a separate incident, Brandon was charged with felony maintenance of a dwelling for the sale of crack cocaine. And then in May, based on yet a third unrelated incident, Brandon was charged with felony common law robbery. Brandon pled guilty to these four counts in July 1997, in return for which the State of North Carolina dismissed five additional drug-related felony counts and four additional drug-related misdemeanor counts. The four offenses to which Brandon had pled guilty were consolidated for sentencing, and Brandon received a suspended sentence, thirty days' imprisonment, and two years' probation.

However, Brandon was made to pay a North Carolina drug tax prior to his July 1997 conviction for possession of crack cocaine. We have held, although the North Carolina courts have rejected the notion, that the North Carolina drug tax constitutes a criminal penalty for purposes of the Double Jeopardy Clause. *See Lynn v. West*, 134 F.3d 582, 588-93 (4th Cir. 1998); *see also State v. Adams*, 513 S.E.2d 588, 589 (N.C. Ct. App. 1999). Brandon argues that, under *Lynn*, his July 1997 drug conviction violated the constitutional protection from double jeopardy, and that therefore his drug conviction may not be

considered as a predicate for purposes of the career offender sentencing guideline. Of course, Brandon's conviction in July 1997 for robbery could still provide the second necessary predicate.[1] But, Brandon argues, all of these offenses were consolidated into a single judgment of conviction that is infirm in light of *Lynn*.[2]

There are several difficulties with Brandon's argument. Brandon pled guilty to four offenses in July 1997: robbery, possession of cocaine, maintenance of a crackhouse, and unlawful possession of a firearm. *Lynn*, to the extent it precludes anything, precludes only a penalty enhancement for Brandon's possession of cocaine. Brandon has never sought relief from the North Carolina courts on the other three counts, and his convictions on those counts have been neither reversed, nor vacated, nor declared constitutionally invalid by any court, state or federal. *See* U.S. Sentencing Guidelines Manual § 4A1.2, cmt. n.6 (2003) (barring collateral attacks on prior convic-

---

[1]The government only points to Brandon's robbery conviction as the second conviction necessary to sentence Brandon as a career offender. The government has not argued that, and thus we do not decide whether, Brandon's conviction for maintenance of a crackhouse could also suffice. *But see* U.S. Sentencing Guidelines Manual § 4B1.2, cmt. n.1 (2003) (providing that maintenance of a crackhouse can constitute a "controlled substance offense" for purposes of career offender guideline).

[2]The Guidelines do define the term "two prior felony convictions" as it is used in § 4B1.1(a). According to the Guidelines,

[t]he term "two prior felony convictions" means

(1)    the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense . . . , and

(2)    the sentences for at least two of the aforementioned felony convictions are counted separately under [§§ 4A1.1 and 4A1.2 of the Guidelines].

U.S. Sentencing Guidelines Manual § 4B1.2(c) (2003). This definition is unilluminating, though, because the very question is whether Brandon has sustained convictions that may be counted for purposes of § 4B1.2(c)(1). Brandon concedes that if his prior convictions may be counted, the sentences for those convictions would be counted separately for purposes of § 4B1.2(c)(2).

tions except as otherwise provided for by law). While *Lynn* may require us to discount a drug conviction that the State of North Carolina continues to recognize as valid, it does not require us to discount other state convictions that do not even arguably violate federal law.

Brandon asserts, however, that there are not multiple convictions that can be disaggregated. According to Brandon, since the state court entered only a single *judgment* in July 1997, the entire proceeding constitutes only a single *conviction* (and an invalid one after *Lynn*). We think that this misinterprets the term "conviction" in the Sentencing Guidelines. In *Deal v. United States*, 508 U.S. 129, 130-31 (1993), the Supreme Court faced essentially the same argument in the context of the federal Armed Career Criminal Act, which imposed both a five-year sentence on the carry or use of a firearm during a violent crime and an additional twenty-year sentence on any "second or subsequent conviction" of the same offense. Deal was convicted in a single judicial proceeding of six counts of violating the Act. *Deal*, 508 U.S. at 130.

In *Deal*, the government claimed that the term "conviction" in the Act meant the finding of guilt by a judge or jury as to a particular offense; thus each finding of guilt on the second through sixth counts was a "subsequent conviction" that triggered the enhanced penalty. *See id.* at 131. Deal claimed that the term "conviction" meant the entry of a final judgment, after the judge or jury had made all of its findings of guilt; thus since there was only a single judgment entered on all six counts, there was no "second or subsequent conviction" to trigger the enhanced penalty. *See id.*

The Court agreed with the government, concluding that the Act's use of the term "conviction" most naturally referred to the finding of guilt by a judge or jury precedent to the entry of a final judgment of conviction. *Id.* at 132. The Court therefore made clear that multiple convictions can and often do occur in a single judicial proceeding. *Id.* at 131-32. Failing to differentiate between convictions embodied in the same judgment, the *Deal* Court noted, would also have led to an unacceptably odd result: the applicability of the twenty-year enhancement would have depended on whether the defendant was charged and tried in separate prosecutions or under a multicount indictment. *Id.* at 133-34. And indeed the Supreme Court and this Court have fre-

quently referred to multiple convictions arising from a single judgment of conviction. *See United States v. Dodson*, 291 F.3d 268, 272-73 (4th Cir. 2002) (collecting references).

Similarly here, while Brandon's July 1997 adjudication resulted in a single judgment of conviction, that judgment encapsulated multiple findings of guilt as to a handful of separate offenses spread out over the course of months. Each of those distinct findings of guilt, stemming from a separate criminal act, is best understood as a "conviction" for purposes of the career offender sentencing guideline. *See, e.g.*, *United States v. Couch*, 291 F.3d 251, 254-56 (3d Cir. 2002) (finding multiple convictions where defendant pled guilty to multi-count indictment under 18 U.S.C. § 924); *United States v. Street*, 257 F.3d 869, 870 (8th Cir. 2001) (finding the same under 16 U.S.C. § 668). Of course, not every defendant convicted of multiple offenses in a single proceeding is a career offender: the convictions must still result in sentences that are not related under §§ 4A1.1 and 4A1.2 of the Guidelines, as Brandon concedes was the case here.

The district court therefore erred in not sentencing Brandon as a career offender. The career offender guideline is intended to punish more strictly those defendants who have previously committed at least two violent or drug-related crimes. There is no question that Brandon robbed someone in May 1997, and that he possessed drugs in December 1998. Brandon's status as a career offender cannot rest on whether the North Carolina courts, for purposes of judicial efficiency, consolidated either of those valid prosecutions with an arguably invalid one.

IV.

Brandon's claim that the district court should have independently reviewed the transcripts of the government's audio recordings is without merit. However, the government correctly contends that Brandon should have been sentenced as a career offender. The judgment of the district court is therefore

*AFFIRMED IN PART, VACATED AND REMANDED IN PART.*