**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4183

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ALEJANDRO CHAVEZ-LOPEZ,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:17-cr-00073-RJC-DCK-2)

Argued:  January 30, 2019                                      Decided:  April 11, 2019

Amended:  April 11, 2019

Before NIEMEYER, AGEE, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:**  Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Caryn A. Strickland, Research & Writing Attorney, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Defendant Alejandro Chavez-Lopez claims that the district court erred in admitting certain evidence and seeks a new trial. In the alternative, he seeks resentencing based on an allegedly defective sentencing enhancement. Finding no reversible error, we affirm the district court's judgment.

I.

A.

Federal agents suspected that Chavez-Lopez was part of a drug-trafficking ring. The agents organized a sting operation and sent a confidential informant to meet Jorge Aguilera, a participant in the ring. The informant asked Aguilera to sell him cocaine. Aguilera agreed to contact Chavez-Lopez's nephew about a possible cocaine sale; later, he met Chavez-Lopez and his nephew at a carwash. The informant contacted them and then came to the carwash, where he discussed the details of a cocaine sale with Chavez-Lopez.

A few days later, Aguilera and the informant texted about the cocaine sale, and the informant agreed to buy two kilos of cocaine. Aguilera forwarded these messages to Chavez-Lopez. Aguilera and Chavez-Lopez then met at a Burger King and arranged a meeting with the informant in a Walmart parking lot. The pair drove to the Walmart and met another conspirator, Robert Fonceca, who got in the car carrying a PlayStation 4 box that held two kilos of cocaine. Chavez-Lopez got out and stood on an island in the parking lot where he could watch the car.

3

The informant arrived, accompanied by an undercover officer. They spoke with Aguilera and Fonceca, who showed them the cocaine in the PlayStation box. While they talked, Chavez-Lopez sent Aguilera a text message giving Aguilera the price he should sell the cocaine for. Aguilera and Fonceca agreed to follow the undercover officer to his house to get the money for the sale. State troopers, who were informed about the sting, followed Aguilera and Fonceca before conducting a traffic stop. The troopers brought in a canine unit, which detected drugs. The troopers then searched the car, found the cocaine, and arrested Aguilera and Fonceca.

Chavez-Lopez, meanwhile, remained behind in the parking lot. After Aguilera didn't respond to his texts, Chavez-Lopez went into a bathroom in the Walmart and sat down in a stall. Several officers entered the bathroom and, after waiting several minutes, entered the stall to arrest Chavez-Lopez, who tried to shove his cellphone in the toilet. During the conspirators' arrests, the agents seized that phone and four others.

## B.

A grand jury indicted Chavez-Lopez, Aguilera, and Fonceca for conspiracy to possess cocaine with intent to distribute. Aguilera and Fonceca pleaded guilty, but Chavez-Lopez stood trial. At his trial, the government presented two key pieces of evidence. First, Aguilera testified about Chavez-Lopez's role in the conspiracy. Second, the government introduced exhibits detailing the conspirators' text messages and call logs, though it did not introduce the underlying data extracted from the seized cellphones.

To lay a foundation for the texts and call logs, the government called Charles Yerry, an intern at the Department of Homeland Security, as a witness. Yerry regularly

4

used software called Cellebrite to extract data from cellphones. At an agent's request, Yerry used the software on the phones seized in this investigation. He photographed the phones and then "hook[ed] them up to the machines and beg[an] the extraction process," saving the data onto an external drive. J.A. 221. Yerry said the process only took a few hours and posed no unusual issues. He did not review the copied data.

The government never sought to qualify Yerry as an expert witness. When he began testifying, the defense objected that Yerry was "not qualified to testify as an expert." J.A. 220. After Yerry testified, the defense renewed its objection, arguing that he had "testified to technical and specialized knowledge." J.A. 226. The district court overruled both objections. The defense, however, did not object for lack of foundation when the government moved to introduce the texts and call logs that Yerry extracted using the Cellebrite software.

The jury convicted Chavez-Lopez of the conspiracy charge. The U.S. Probation Office recommended applying the Sentencing Guidelines' career offender enhancement. The defense did not object to that enhancement, and the district court sentenced Chavez-Lopez to about 22 years in prison. Chavez-Lopez now appeals both his conviction and his sentence.

II.

Chavez-Lopez makes two closely related arguments in support of his request for a new trial. First, he contends that the district court should not have allowed Yerry to testify without qualifying him as an expert. Chavez-Lopez preserved this argument in the

5

district court. Second, he contends that the district court should not have admitted the text messages and call logs without expert testimony describing the data extraction. Chavez-Lopez did not preserve this argument, so we can review it only for plain error. For both arguments, we hold that the district court committed no reversible error.

A.

Chavez-Lopez first contends that Yerry improperly gave expert opinion testimony. In Chavez-Lopez's view, Yerry's testimony about the extraction of the cellphone data necessarily involved an opinion about the accuracy of Cellebrite, which he says only an expert could offer. The district court twice overruled an objection to this effect. We review the district court's decision admitting this testimony for abuse of discretion. *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006).

All witnesses may testify to facts within their personal knowledge. But for opinion testimony, the Federal Rules distinguish between reasoning familiar in everyday life and reasoning that requires expertise. *See United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). Experts may thus offer opinions based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Lay witnesses, in contrast, may only offer opinions that are "rationally based on [their] perception," helpful to the jury, and not based on specialized knowledge. Fed. R. Evid. 701. So, a lay witness may testify that a substance looks like blood but not that certain bruises indicate head trauma. *See Perkins*, 470 F.3d at 155.

Under this standard, Yerry did not give expert testimony. First, Yerry did not offer an opinion. His brief testimony concerned the actions he took to extract the data—

6

hooking the phones up to a computer, following a few prompts, and saving data onto an external drive. Yerry's role as a witness is, therefore, best characterized as testifying about facts in his personal knowledge.

Second, to the extent Yerry offered an opinion, it was lay testimony. Chavez-Lopez contends that Yerry implicitly vouched for Cellebrite's accuracy in extracting data. But Yerry offered no assurances about how well Cellebrite performed. At most, he offered the opinion that Cellebrite copies data from a cellphone, which he derived from his personal experience using the software. That testimony requires no more specialized knowledge than other opinions we have considered lay testimony, such as police officers' testimony that a substance they observed was methamphetamine, that a shorthand statement made to them carried a certain meaning, or that an observed use of force was objectively reasonable. *United States v. Hoston*, 728 F. App'x 223, 224 (4th Cir. 2018); *United States v. Min*, 704 F.3d 314, 324–25 (4th Cir. 2013); *Perkins*, 470 F.3d at 156. Yerry's testimony didn't require a technical understanding of Cellebrite, and he made no claims about the program's effectiveness or reliability. He only testified about copying data from one drive to another, which is "the product of reasoning processes familiar to the average person in everyday life." *United States v. Baraloto*, 535 F. App'x 263, 271 (4th Cir. 2013) (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)); *see also In re D.H.*, No. A140779, 2015 WL 514336, at *6 (Cal. Ct. App. Feb. 6, 2015) (holding that an officer gave only lay testimony about the extraction of data using Cellebrite because "[t]he idea that images may be downloaded from a cell phone is familiar to the general population").

7

For these same reasons, the Second Circuit has held that a police officer gave lay testimony when he discussed the extraction of data using Cellebrite. *See United States v. Marsh*, 568 F. App'x 15, 16–17 (2d Cir. 2014) (holding that an officer gave lay testimony because he "did not purport to render an opinion based on the application of specialized knowledge to a particular set of facts" when discussing the extraction of cellphone data through Cellebrite). Other courts have come to the same conclusion. *See United States v. McLeod*, No. 16-50013, 2019 WL 468798, at *1–2 (9th Cir. Feb. 6, 2019); *United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017); *D.H.*, 2015 WL 514336, at *6. *But see McLeod*, 2019 WL 468798, at *4 (Molloy, J., dissenting in part and concurring in part) (contending that a detective who testified about data extraction using Cellebrite gave expert testimony without qualification).

Chavez-Lopez relies on two cases that are inapposite because both concern testimony that required much more technical expertise. In an unpublished decision, this court affirmed the district court's decision to exclude the testimony of a witness who would have testified (without qualification as an expert) to her forensic analysis of data from the defendant's computer and to her conclusion that a third party might have had access to the computer. *United States v. Yu*, 411 F. App'x 559, 566 (4th Cir. 2010). And in *United States v. Ganier*, the Sixth Circuit held that a witness would give expert testimony if he discussed how to interpret data extracted by forensic software and how to use it to recreate a user's search history. 468 F.3d 920, 926 (6th Cir. 2006). In both of those cases, the relevant witness (unlike Yerry) would have testified about their interpretation of extracted data. *Ganier*, furthermore, made the useful analogy that expert

8

testimony is necessary to describe specialized medical tests but not to describe reading a thermometer. *Id.* Yerry's testimony that he copied information from a phone to a hard drive is, in our view, closer to the latter. Therefore, the district court did not err in admitting his testimony as lay testimony.

B.

Chavez-Lopez also contends that the district court erred by admitting certain text messages and call logs without expert testimony about the data extraction process. But, as the government points out, Chavez-Lopez never challenged the admission of this evidence before the district court. The closest the defense came to objecting was right after Yerry left the stand when defense counsel said, "I would like to . . . renew my objection that [Yerry] is an expert and the government has not properly laid the foundation which I believe they're going to try to introduce some text messages." J.A. 226. But the district court understood and addressed the objection only in terms of whether Yerry gave expert testimony, making no mention of whether data from the phones was admissible. When the government later moved to introduce the texts and call logs, the defense didn't object on the basis that expert testimony was required.[1] Because the defense never asked the court to exclude the texts and call logs, we review this issue for plain error. Fed. R. Crim. P. 51(b), 52(b).

---

[1] The district court's ruling that Yerry offered lay testimony didn't make such an objection futile. In fact, establishing that Yerry was offering lay testimony was a necessary predicate for objecting that the texts and call logs couldn't be admitted without expert testimony.

9

To prevail, Chavez-Lopez must show "that an error occurred, that the error was plain, and that the error affected his substantial rights." *United States v. Ellis*, 326 F.3d 593, 596 (4th Cir. 2003). The term "plain" means clear or obvious at the time of appellate review. *See United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013). No Fourth Circuit or Supreme Court precedent dictates that expert testimony is necessary to authenticate information simply copied from a cellphone to a hard drive. In fact, our cases suggest that expert testimony may be unnecessary for standard copying techniques. *See United States v. Spence*, 566 F. App'x 240, 244 (4th Cir. 2014) (holding that the government properly authenticated audio recordings copied from tapes to CDs, without offering expert testimony); *United States v. Wilson*, 115 F.3d 1185, 1188–89 (4th Cir. 1997) (holding that the government properly authenticated a "composite tape" made from original tapes, without offering expert testimony).

Other courts have admitted data copied by Cellebrite without expert testimony. *See Seugasala*, 702 F. App'x at 575; *D.H.*, 2015 WL 514336, at \*5–6. We have not held to the contrary. The unpublished case Chavez-Lopez relies on, *United States v. Yu*, held only that a lay witness could not testify to her forensic analysis of a hard drive. 411 F. App'x at 566. *Yu* didn't concern whether expert testimony is necessary to introduce data copied from a phone. Thus, even if there was error in admitting the texts and call logs, it was not plain.

III.

Chavez-Lopez also challenges his sentence, contending that he was improperly designated a career offender under the Sentencing Guidelines. A defendant is a career offender (and therefore subject to an enhanced sentencing range) only if the instant offense and two prior felony convictions are crimes of violence or controlled substance offenses. U.S.S.G. § 4B1.1(a). There is no dispute that Chavez-Lopez has two predicate felonies. But Chavez-Lopez contends that the instant offense—a drug conspiracy under 21 U.S.C. § 846—isn't a controlled substance offense and thus the career offender enhancement cannot apply.

Ordinarily, we review whether an offense is a controlled substance offense de novo. *United States v. Dozier*, 848 F.3d 180, 182–83 (4th Cir. 2017). But as Chavez-Lopez concedes, plain error review is appropriate here because he didn't object to the career offender enhancement in the district court. *Carthorne*, 726 F.3d at 509.[2]

Chavez-Lopez rests his challenge to his sentence on *United States v. McCollum*, which we decided after his sentencing. 885 F.3d 300 (4th Cir. 2018). That case extended *Dozier*, a circuit precedent which held that an attempt offense can't be a career offender predicate if it is broader than the generic definition of attempt. 848 F.3d at 186. In *McCollum*, we held that the generic definition of conspiracy requires an overt act and that

---

[2] Although Chavez-Lopez claims that circuit law changed after his sentencing, an intervening change in the law has no effect on the standard of review. *See, e.g.*, *United States v. David*, 83 F.3d 638, 645 (4th Cir. 1996) (holding that plain error is the proper standard of review when a criminal defendant does not make an objection that would have been futile in light of then-established precedent).

the federal crime of conspiracy to commit murder in aid of racketeering is broader than generic conspiracy because it doesn't require an overt act. 885 F.3d at 307–09. In an unpublished opinion, we applied *McCollum* to hold that a conspiracy under 21 U.S.C. § 846—the crime Chavez-Lopez was convicted of—is not a controlled substance offense because it too doesn't require an overt act. *United States v. Whitley*, 737 F. App'x 147, 148–49 (4th Cir. 2018).

If that were the only relevant case law, the district court might well have committed a plain error. But it isn't. Long before *McCollum*, this court stated that a § 846 conspiracy would "clearly qualify as a career offender offense." *United States v. Kennedy*, 32 F.3d 876, 888 (4th Cir. 1994). The defendant in *Kennedy* contested that issue on appeal, although his argument appears to have been that the Sentencing Commission exceeded its statutory authority by enumerating drug conspiracies as controlled substance offenses. *Id.* at 888–90. We rejected Kennedy's argument and emphasized that "[a]s a matter of simple logic, a conviction of conspiracy to distribute controlled substances would seem to qualify as a federal narcotics offense." *Id.* at 889–90. Several subsequent decisions that the government cites—two of them published—also concluded that § 846 conspiracies are controlled substance offenses, albeit with minimal reasoning. *See United States v. Brandon*, 363 F.3d 341, 345 (4th Cir. 2004); *United States v. Walton*, 56 F.3d 551, 555 (4th Cir. 1995); *United States v. Meadows*, No. 04-4396, 2006 WL 521706, at *3 (4th Cir. Mar. 3, 2006); *United States v. Mullins*, No. 97-4257, 1998 WL 614191, at *1 (4th Cir. Sept. 12, 1998); *United States v. Massie*, No. 95-5564, 1997 WL 107743, at *2 (4th Cir. Mar. 12, 1997).

12

Although *McCollum* and *Whitley* are on point, *Kennedy* and subsequent cases cast enough doubt on Chavez-Lopez's argument that any error isn't clear or obvious enough to be plain. This court has repeatedly concluded that § 846 conspiracies are controlled substance offenses. It's not clear that those cases confronted the exact issue in this appeal. But neither *McCollum* nor *Whitley* distinguished *Kennedy* or the other cases the government cites, leaving open the question of which precedent controls. So, if the district court erred, any error is not plain. Chavez-Lopez is, therefore, not entitled to resentencing.

*AFFIRMED*